**CONFIDENTIAL**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| CALIFORNIA INDUSTRIAL FACILITIES RESOURCES, INC. dba CAMSS SHELTERS, Plaintiff, | CASE NUMBER ____________ |
| v. | |
| THE UNITED STATES OF AMERICA, Defendant. | JUDGE: ____________ |

COMPLAINT

Plaintiff, CALIFORNIA INDUSTRIAL FACILITIES RESOURCES, INC. dba CAMSS SHELTERS ("CAMSS Shelters"), brings this bid protest action against the UNITED STATES OF AMERICA, acting through the Department of the Air Force ("Air Force"). The protest arises out of the Air Force's award of a contract to Alaska Structures for nine shelters. In support of its cause of action, CAMSS Shelters states as follows:

PARTIES

1. CAMSS Shelters is a corporation duly organized under the laws of Alaska with its principal place of business at 13960 179th Avenue SE, Monroe, Washington.

2. The United States, through the Air Force, issued Solicitation Number FA4452-07-Q-A055 (the "Solicitation"), a request for quotes for nine brand-name or equal shelters.

**CONFIDENTIAL**

JURISDICTION

3. This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2005).

FACTS

1. CAMSS Shelters is a small business concern that designs and manufactures shelters for commercial and military customers. Currently, there are over 1 million square feet of CAMSS Shelters in use in Iraq by all branches of the military, including the Air Force.

2. As noted in the Contractor Performance Assessment Report ("CPAR") submitted by CAMSS Shelters as part of its response to the Solicitation under protest, they have received an "Exceptional" rating for "Quality of Product or Service", "Schedule", and "Business Relations" and a "Very Good" rating for "Management of Key Personnel." Attachment ("Att.") 1[1], page 16. The CPAR was issued as part of a multimillion dollar contract CAMSS Shelters has with the Air Force for the delivery of shelters. As noted in the CPAR:

> Upon contract award, the shelter system was subjected to severe laboratory and climatic testing. In addition, a complete, detailed, controlled, operational test and evaluation was conducted by AFOTEC [the Air Force Operational Test and Evaluation Center]. Upon successful completion of these tests and evaluations, a production option was exercised.

Att. 1, page 16

3. On May 24, 2007, the Air Force issued a Request for Quotes to GSA Schedule holders only for seven "Alaska Extreme 1836 Shelter (Tan) Including Electrical/Lighting Kits, Plenum, One Piece Liner, Vinyl Floor and Soft Bag Carrying System Part Number AK-18EXT-26-2"

[1] Attachments have been sequentially numbered by counsel for ease of reference.

with the words "Brand Name or Equal."[2] There were no salient characteristics associated with this Request for Quotes in violation of 11.104(b) which states:

> Brand name or equal purchase descriptions must include, in addition to the brand name, a general description of those salient physical, functional, or performance characteristics of the brand name item that an "equal" item must meet to be acceptable for award. Use brand name or equal descriptions when the salient characteristics are firm requirements.

4. The response date for this initial Request for Quotes was 15 days later on June 8, 2007.

5. The delivery date of the shelters for this initial Request for Quotes was August 31, 2007.

6. The May 24, 2007 Request for Quotes was apparently sent to five GSA schedule holders including Alaska Shelters. The only quote received was from Alaska Shelters.

7. On May 29, 2007, Mr. Jimmy C. White, Command Sergeant Major, USA (Ret.) and Director for Military Applications Sales for Alaska Structures submitted what appears to be Alaska Structures response to the initial Request for Quotes. In his email, Mr. White states that "I fat fingered the part number. The correct part number is AK-1826-XTR-2" which is different from the part number listed in the initial Request for Quotes- AK-18EXT-26-2. .

8. The May 29, 2007 quote from Alaska Structures provided for a delivery date beyond that what was required by the initial Request for Quotes. Alaska Structures stated a delivery date of "90 Days ARO" while the initial Request for Quotes called for delivery by August 31, 2007.

9. The May 29, 2007 quote from Alaska Structures clearly stated: "NON GSA ITEM COMMERCIAL PRICING".

---

[2] This matter has been the subject of previous protests before the Government Accountability Office in which the Air Force produced documents under a protective order. References to such documents are taken from the public version of documents filed in that matter. Out of an abundance of caution, the actual documents themselves are not attached so as not to violate the terms of the protective order.

10. The May 29, 2007 quote from Alaska Structures also provided for shipping costs and wood crate costs although the initial Request for Quotes provided for "FOB Point: Destination".

11. On June 4, 2007, prior to the closing date for receipt of quotes, the Air Force apparently emailed Alaska Structures "requesting an earlier delivery date or 45 Days ARO."

12. On June 4, 2007, Mr. White, sent Ms. Brown two documents, one described as "HQ AMC A3MMM, Alaska Structures Quote w-Shipping.doc" with the statement that: "I've change the attached to 45 days ARO. Please let me know if you need any additional information." The Alaska Structures quote that follows in the AR is still dated May 29, 2007 but the delivery date has been changed from the quotation dated May 29, 2007 from "90 Days ARO" to "45 Days ARO."

13. On June 7, 2007, again before the June 8, 2007 closing date for receipt of quotes, Ms. Brown sent an email to Mr. White and asked him for a revised quote and whether the shelters were on Alaska Structures' GSA schedule. Ms. Brown stated:

> Good Afternoon Jimmy I need you to revise your quote to include the shipping charges in the total cost for the shelters. This is FOB Destination no separate shipping cost. Please let me know also if I award the contract on 11 June 2007. The estimated delivery date required is 25 July 2007. Are these shelters quote from your GSA Schedule. I need you to email me the terms and conditions of your GS-07F-0084K. ASAP.

14. After receipt of Ms. Brown's June 7, 2007 email, Mr. Brown, on June 8, 2007 sent Ms. Brown an email and stated:

> Hi Naomi, Please review the attached when you have the time. I've modified the quote and added the terms and conditions. Please let me know if you need any additional information and thanks for the call today. Jimmy

There are no referenced documents attached to the email. It appears that Mr. White did not attach any documents because he makes the statement in an email the next day, "Second try, Jimmy."

15. There is no evidence that the Air Force held discussions prior to receipt of quotes with any of the other solicited offerors or that the other solicited offerors were notified of the increase in quantity.

16. On June 8, 2007, Mr. White sent Ms. Brown four documents. It is unclear which documents were sent by Mr. White. In Mr. White's email, he describes one of the documents as "AKS Quote w-Shipping 5 Jun 07.doc".

17. On June 18, 2007, the Air Force decided to reissue the initial Request for Quotes as an open market solicitation.

18. Only because the Air Force finally recognized that the products being solicited from Alaska Structures were not on Alaska Structures' GSA multiple award schedule did the Air Force finally decide to reissue the solicitation as an open market small business set-aside. There is no evidence to support a conclusion that the Air Force reissued the initial Request for Quotes as an open market solicitation in order to obtain competition. In fact, the evidence is otherwise because the FedBizOpps notice gave offerors just 6 days to respond, two of which were weekend days.

19. On June 22, 2007, the Air Force issued a Combined Synopsis/Solicitation ("Solicitation") for a "Brand Name or Equal Alaska Extreme 1836 Shelter (Tan) including Electrical/Lighting Kits, Plenum, one piece liner, Part # AK-18EXT-26-2, quantity of 9 each." Att. 2 at page 1.

20. The Solicitation stated:

> The contractor is to provide Brand Name or Equal Alaska Extreme 1836 Shelter (Tan) including Electrical/Lighting Kits, Plenum, one piece liner, Part # AK-18EXT-26-2, quantity of 9 each. The fopllowing [sic] salient characteristics are applicable for Brand Name or Equal:

SPECIFICATION CHECKLIST

1 MAXIMUM WIDTH: 18'

2 MAXIMUM LENGTH: 26'

3 MAXIMUM HEIGHT AT PEAK: 9'

4 MINUMUM [sic] FOOTPRINT: 468 SQ

5 FRAME MATERIAL: ALUMINUM

6 COVER MATERIAL: 15 OZ/SQUARE YARD MIL-SPEC VINYL FABRIC (MINIMUM)

7 COMPLETE ALUMINUM BASE SYSTEM WITH LOCKING PINS

8 MAXIMUM LENGTH OF ANY FRAME SECTION: 84"

9 MAXIMUM WEIGHT OF ANY FRAME SECTION: 7 LBS

10 FLOOR MATERIAL: 15 OZ SQUARE YARD NON-SLIP VINYL FABRIC (MINIMUM)

11 (1) ONE PIECE PULL OVER LINER WITH TWO SIDE ENTRYS, [sic] TWO STOVE PIPE OPENINGS, TWO SETS OF ECU PORTS AND HOOK /LOOP FASTENERS

12 THE ONE-PIECE LINER SYSTEM MUST HAVE BEEN TESTED AND APPROVED BY THE USAF IN A U.S. GOVERNMENT TEST FACILITY

13 2-PIECE 16" DIAMETER PLENUM WITH ELBOW SECTION THAT ATTACHES TO SUPPLY DUCT OF ECU/HVAC UNIT

14 MAXIMUM WEIGHT OF EACH ELECTRICAL CABLE IS: 9 LBS

15 (8) 50W PORTABLE FLOURESCENT [sic] LIGHTS WITH ON/OFF SWITCHES AND QUICK CONNECT MOUNTING BRACKETS

16 (1) LIGHT WEIGHT ALUMINUM 20 AMP POWER CONTROL BOX WITH ILLUMINATED CIRCUIT BREAKER ROCKER SWITCHES AND MILSPEC CONNECTORS

17 (1) 50' POWER CABLE

**CONFIDENTIAL**

18 (2) 120V RECEPTACLE LINES WITH 3 MOLDED TRI-PLEX OUTLETS

19 EACH END PANEL INCLUDES (1) 3' X 7' ZIPPER ENTRY, TENT CONNECTOR FLAP, (2) 30" X 42" RECTANGULAR NET VENT WINDOWS AND INSULATED

20 MAXIMUM WEIGHT OF EACH END PANEL = 55 LBS

21 COVER TO INCLUDE A MAIN COVER CONNECTOR FLAP TO ATTACH TO OTHER SHELTERS

22 COVER TO INCLUDE (2) 6" STOVE PIPE OPENINGS WITH FIRE-RESISTANCE RING

23 MAIN COVER TO INCLUDE QTY 2- 18" DIAMETER HVAC PORTS, AND (1) 6" ELECTRICAL CABLE PORT EACH SIDE

24 SHELTER AND ACCESSORIES TO BE PACKED AND STORED IN 12 CARRY BAGS. THE MAXIMUM WEIGHT OF ANY ONE BAG IS 130 LBS.

25 MINIMUM USABLE LIFE EXPECTANCY 10 YEARS WITH CONSTANT USE AND A 20 YEAR SHELF LIFE

26 SET UP TIME TO BE LESS THAN 20 MINUTES WITH A TRAINED 6-PERSON CREW

27 SHELTER MUST HAVE BEEN SUCCESSFULLY TESTED BY AN INDEPENDANT [sic] LABORATORY TO WITHSTAND A 80 MPH SUSTAINED WIND LOAD FOR AT LEAST 30 MINUTES WITH INTERMITTENT 100 MPH WIND GUST (INCLUDE FINAL TEST REPORT WITH BID)

28 SHELTER MUST HAVE BEEN SUCCESSFULLY TESTED BY AN INDEPENDANT [sic] LABORATORY TO WITHSTAND A 15 POUND PER SQUARE FOOT SNOW LOAD (INCLUDE FINAL TEST REPORT WITH BID)

21. The Solicitation also stated: “When proposing an equal product be sure to to [sic] submit documentation which demonstrates the items comliance [sic] with the ***characteristics*** as mentioned above.” Emphasis added; Att. 2 at 3.

22. The Solicitation listed a required delivery date of August 31, 2007.

**CONFIDENTIAL**

23. CAMSS Shelters submitted a timely offer on June 28, 2007 in the amount of $97,410.99 which was $85,604.01 less than Alaska Structures' offer of $183,015.00. Att. 1. CAMSS Shelters offered as an equal shelter its CAMSS18EX Expeditionary Shelter System with One-Piece Liner System. The CAMSS Shelters offer confirmed that it was offering shelters with two side entries, two end entries and two quick-connect 110v/20 amp outlet strings with 3 molded tri-plex outlets. The CAMSS Shelters offer also offered shelters that are: "[e]ngineered to withstand 80 mph sustained wind load for at least 30 minutes, with 100 mph gusts…." Att. 1 at 2.

24. The CAMSS Shelters offer did not take exception with the Solicitation's required delivery date of August 31, 2007. Att. 1.

25. Alaska Structures submitted its offer on June 25, 2007 and offered an "or equal" product. The Solicitation called for a "Brand Name or Equal Alaska Extreme ***1836*** Shelter (Tan) including Electrical/Lighting Kits, Plenum, one piece liner, ***Part # AK-18EXT-26-2***, quantity of 9 each." Emphasis added; Att. 2 at 2. Alaska Structures' offer was for an "Alaska Extreme ***1826*** Shelter, (Tan) Includes; Electrical/Lighting Kits, Plenum, One Piece Liner, Vinyl Floor & Soft Bags Carrying System" that carries a "Part #" of "***AK-1826-XTR-2***." Emphasis added.

26. Alaska Structures' offer consisted of 3 pages—one page of pricing, one page of an apparent standard limited one-year warranty, and one page of apparent standard terms and conditions. The Alaska Structures offer did not describe compliance with any of the salient characteristics listed in the Solicitation. The Alaska Structures offer also varied the required delivery date by stating that delivery would occur 30 days after receipt of offers.

27. Not only did Alaska Structures' offer not describe compliance with any of the salient characteristics, the offer provided an express limited warranty of just one year rather than the

required 10 year life expectancy, with no warranty whatsoever on the critical zipper component of the shelters. In addition, Alaska Structure's offer apparently provided a structure with only two or three doors and not the four doors required by the Solicitation.

28. The Air Force made an award to Alaska Shelters on July 2, 2007.

29. The Air Force did not notify CAMSS Shelters of the award but rather on July 11, 2007, Mr. Evan Bahe, Marketing Manager telephoned Ms. Brown to inquire about the procurement status. He was informed that it had been awarded to Alaska Structures on July 2, 2007.

30. On July 11, 2007, CAMSS Shelters sent a written request for a debriefing.

31. On July 12, 2007, ten days after award had been made, CAMSS Shelters, the only other offeror to the Solicitation, received the Notice to Unsuccessful Offeror" from the Air Force.

32. On July 12, 2007, CAMSS Shelters filed a protest at the Government Accountability Office ("GAO") of the July 2, 2007 award. Att. 3.

33. On July 13, 2007, CAMSS Shelters filed an amended protest adding a grounds of protest regarding a violation of FAR 9.206-1(a). Att. 4.

34. On July 16, 2007, the Air Force conducted a telephonic debriefing with CAMSS Shelters.

35. During that telephonic debriefing, the Air Force notified CAMSS Shelters that its offer had been rejected because it had failed to submit final independent test reports for wind load, snow load, and for the one piece pull over liner system. In addition, the Air Force concluded that CAMSS Shelters' offer of a 110V receptacle was not compliant with a requirement for a 120V receptacle.

36. On July 20, 2007, CAMSS Shelters filed a Second Amended Protest adding an additional grounds of protest alleging that Alaska Shelter did not submit proper test results. Att. 5.

37. On October 22, 2007, GAO denied CAMSS Shelters' protest.[3]

## Count I

(Violation of 10 U.S.C. § 2319(c)(3)) and FAR 9.206-1(a))

38. Plaintiff incorporates by reference the allegations in paragraphs 1 through 37 above.

39. Section 2319(c)(3) to title 10 U.S.C. states:

> A potential offeror may not be denied the opportunity to submit and ***have considered*** an offer for a contract solely because the potential offeror (A) is not on a qualified bidders list, qualified manufacturers list, or qualified products list, or (B) has not been identified as meeting a qualification requirement established after October 19, 1984, if the potential offeror can demonstrate to the satisfaction of the contracting officer (or, in the case of a contract for the procurement of an aviation critical safety item or ship critical safety item, the head of the design control activity for such item) that the potential offeror or its product meets the standards established for qualification or can meet such standards before the date specified for award of the contract.

Emphasis added.

40. Pursuant to this statutory language, the Air Force was required to consider CAMSS Shelters' proposal, and if it met all of the properly stated salient physical, functional or performance characteristics of the Solicitation thereby making it technically acceptable, should have awarded the contract to it as the lowest price offeror, consistent with the terms of the Solicitation.

41. The term "qualification requirement" is defined at 10 U.S.C. § 2319(a) as: "[i]n this section, the term 'qualification requirement' means a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of a contract."

[3] The GAO decision remains subject to a protective order at the time of this filing.

42. The three testing requirements stated in the Solicitation that the Air Force improperly enforced against CAMSS Shelters that resulted in the Air Force rejecting CAMSS Shelters' proposal meet the definitions of a "qualification requirement" including:

> 12 THE ONE-PIECE LINER SYSTEM MUST ***HAVE BEEN TESTED*** AND APPROVED BY THE USAF IN A U.S. GOVERNMENT TEST FACILITY
>
> 27 SHELTER ***MUST HAVE BEEN SUCCESSFULLY TESTED*** BY AN INDEPENDENT LABORATORY TO WITHSTAND A 80 MPH SUSTAINED WIND LOAD FOR AT LEAST 30 MINUTES WITH INTERMITTENT 100 MPH WIND CUTS (INCLUDE FINAL TEST REPORT WITH BID)
>
> 28 SHELTER ***MUST HAVE BEEN SUCCESSFULLY TESTED*** BY AN INDEPENDENT LABORATORY TO WITHSTAND A 15 POUND PER SQUARE FOOT SNOW LOAD (INCLUDE FINAL TEST REPORT WITH BID)

Emphasis added; Att. 2 at 2-3.

43. The Air Force violated statute by enforcing qualification requirements against CAMSS Shelters which offered otherwise compliant products at one half the cost of the awardee.

44. CAMSS Shelters was materially prejudiced by the enforcement of the qualification requirement against it. Had the Air Force complied with statute and regulation, it would have awarded the contract to CAMSS Shelters.

## **Count 2**

(Violation of FAR, 48 C.F.R. § 9.206-1(a))

45. Plaintiff incorporates by reference the allegations in paragraphs 1 through 44 above.

46. Section 9.206-1(a) of the FAR, which implements 10 U.S.C. § 2319(c)(3), states unequivocally: "[a]gencies ***may not enforce*** any QPL, QML, or QBL without first complying with the requirements of 9.202(a)." Emphasis added. This equally unambiguous language does not prohibit an agency from utilizing a Qualified Products List in a Solicitation, rather the

language prohibits the enforcement against an otherwise qualified offeror of the lack of acceptance on the QPL.

47. At no time did the Air Force comply with the requirements of 9.202(a).

48. The term "qualification requirement" is similarly defined at FAR 2.101 which states: "Qualification requirement means a Government requirement for testing or other quality assurance demonstration that must be completed before award of a contract."

49. The FAR defines a Qualified Products List as: "[A] list of products that have been examined, tested, and have satisfied all applicable qualification requirements.
FAR 2.101."

50. The three testing requirements stated in the Solicitation that the Air Force improperly enforced against CAMSS Shelters that resulted in the Air Force rejecting CAMSS Shelters' proposal meet the definitions of a "qualification requirement" and a "qualified products list" were:

> 12 THE ONE-PIECE LINER SYSTEM MUST ***HAVE BEEN TESTED*** AND APPROVED BY THE USAF IN A U.S. GOVERNMENT TEST FACILITY
>
> 27 SHELTER ***MUST HAVE BEEN SUCCESSFULLY TESTED*** BY AN INDEPENDENT LABORATORY TO WITHSTAND A 80 MPH SUSTAINED WIND LOAD FOR AT LEAST 30 MINUTES WITH INTERMITTENT 100 MPH WIND CUTS (INCLUDE FINAL TEST REPORT WITH BID)
>
> 28 SHELTER ***MUST HAVE BEEN SUCCESSFULLY TESTED*** BY AN INDEPENDENT LABORATORY TO WITHSTAND A 15 POUND PER SQUARE FOOT SNOW LOAD (INCLUDE FINAL TEST REPORT WITH BID)

Emphasis added; Att. 2 at 2-3.

51. The Air Force violated regulation by enforcing the qualified products list against CAMSS Shelters which offered otherwise compliant products at one half the cost of the awardee.

52. CAMSS Shelters was materially prejudiced by the enforcement of the qualification requirement against it. Had the Air Force complied with statute and regulation, it would have awarded the contract to CAMSS Shelters.

**Count 3**

(Award Inconsistent With Statute and Solicitation Terms)

53. Plaintiff incorporates by reference the allegations in paragraphs 1 through 52 above.

54. Section 2305(b) of 10 U.S.C. requires that: "[t]he head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."

55. The Solicitation specified a "Brand Name or Equal Alaska Extreme 1836 Shelter (Tan) including Electrical/Lighting Kits, Plenum, one piece liner, Part # AK-18EXT-26-2, quantity of 9 each."

56. The Solicitation required that offerors: "[w]hen proposing an equal product be sure to to [sic] submit documentation which demonstrates the items comliance [sic] with the ***characteristics*** as mentioned above."

57. The awardee did not submit the brand name cited in the Solicitation but apparently submitted an offer for an or equal product described as "Alaska Extreme 1826 Shelter, (Tan) Includes; Electrical/Lighting Kits, Plenum, One Piece Liner, Vinyl Floor & Soft Bags Carrying System" that carries a "Part #" of "AK-1826-XTR-2."

57. The Air Force awarded the contract to Alaska Structures notwithstanding the fact that its offer did not identify that it would comply with the salient physical, functional or performance characteristics in violation of 10 U.S.C. §2305(b).

58. By awarding the contract to Alaska Structures for shelters that were not the brand name and did not specify how they would meet the specifications, the Air Force violated 10 U.S.C. § 2305(b).

60. But for the violation by the Air Force of 10 U.S.C. § 2305(b), CAMSS Shelters would have been awarded the contract having offered compliant shelters at a significantly lower price.

**Count 4**

(Violation of 10 U.S.C. § 2305(b))

61. Plaintiff incorporates by reference the allegations in paragraphs 1 through 60 above.

62. The Solicitation specified that the shelters must have: "11 (1) ONE PIECE PULL OVER LINER WITH TWO SIDE ENTRYS, [sic]…."

63. The Solicitation specified that the shelters must have: "19 EACH END PANEL INCLUDES (1) 3' X 7' ZIPPER ENTRY…."

64. The Solicitation specified that the shelters must have: "25 MINIMUM USABLE LIFE EXPECTANCY 10 YEARS WITH CONSTANT USE AND A 20 YEAR SHELF LIFE".

65. The Air Force awarded the contract to Alaska Structures notwithstanding the fact that its offer took specific exception to at least two specific salient characteristics: the 10 year useful life and did not offer a shelter with two side entries and two end panel entries. The structure proposed by Alaska Structures had only a one year warranty with no warranty on the zipper at all and, based on information and belief, had 2 or 3 doors not 4 based on test results proffered by Alaska Structures.

66. By awarding the contract to Alaska Structures for shelters that took specific exception to mandatory requirements of the Solicitation, the Air Force violated 10 U.S.C. § 2305(b).

67. But for the violation by the Air Force of 10 U.S.C. § 2305(b), CAMSS Shelters would have been awarded the contract having offered compliant shelters at a significantly lower price.

WHEREFORE, Plaintiff, CAMSS Shelters prays that this Court enter judgment in this matter as follows:

a. Enjoining Defendant from performance under Solicitation Number FA4452-07-Q-A055 or any other solicitation for the same project;

b. Enjoining Defendant from proceeding with the subject procurement until it properly evaluates CAMSS Shelters' and Alaska Structures proposal consistent with the terms of the solicitation and the applicable procurement laws;

c. Awarding a contract to the offeror submitting the proposal that represents the best value to the government consistent with the terms of the solicitation; and

d. Awarding CAMSS Shelters such other and further relief as this Court may deem necessary and proper.

Respectfully submitted,

William A. Shook

Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street NW
Washington, DC 20006
Tel: (202) 661-6256
Fax: (202) 778-9100
Email: bill.shook@klgates.com

Date: October 23, 2007