**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**(BID PROTEST)**

| | |
|---|---|
| CALIFORNIA INDUSTRIAL FACILITIES RESOURCES, INC. d/b/a CAMSS SHELTERS<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>and<br><br>ALASKA STRUCTURES, INC.,<br><br>Intervenor. | No. 07-740<br>Judge Baskir |

**INTERVENOR ALASKA STRUCTURES, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION**

January 15, 2008

Robert J. Moss, Counsel of Record
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-2200 (telephone)
(202) 420-2201 (facsimile)
MossR@dicksteinshapiro.com (email)

Of Counsel:
Richard J. Conway
Justin A. Chiarodo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-2200 (telephone)
(202) 420-2201 (facsimile)
ConwayR@dicksteinshapiro.com (e-mail)
ChiarodoJ@dicksteinshapiro.com (e-mail)

Pursuant to RCFC 52.1, Intervenor Alaska Structures, Inc. ("AKS"), by its counsel, hereby files its Reply Brief in Support of its Motion for Judgment on the Administrative Record and Opposition to the Cross-Motion of Plaintiff California Industrial Facilities Resources, Inc. ("CAMSS").

INTRODUCTION

Try as it might, CAMSS cannot identify any impropriety in this procurement. The United States Air Force ("Air Force") properly rejected CAMSS' proposal because it did not comply with the RFP's mandatory requirements. Even setting aside the question of whether CAMSS submitted the mandatory wind and snow load test results (it did not), CAMSS admits that it offered a 110 volt electrical system, rather than a 120 volt system as required by the RFP. The Air Force required a 120 volt system for safety reasons, and properly rejected CAMSS' proposal as noncompliant. *See* AR 258. CAMSS does not dispute that it offered a noncompliant 110 volt electrical system, but argues that its failure to provide a compliant system should be overlooked because there is very little difference between 110 volt and 120 volt systems. CAMSS does not, however, refute the fact that there is a *safety-related* difference between the two types of systems. The Air Force properly rejected CAMSS' proposal as noncompliant, and CAMSS lacks standing to maintain this action.

CAMSS' other arguments are equally without merit. Time and again, CAMSS asserts that the Air Force violated the law or otherwise acted unreasonably, but in each instance, the conduct in question is perfectly permissible under the applicable statute or regulation. For example, CAMSS argues that the Air Force acted improperly by contacting AKS before issuance of the RP to obtain the salient characteristics for the AKS brand-name shelters that the Air Force required. CAMSS asserts that that exchange of information was improper, but fails to cite any statute or regulation prohibiting such exchanges. That is because the Federal Acquisition

Regulation ("FAR") *encourages* agencies to exchange information with potential offerors to identify technical specifications for products that will meet the agency's needs. *See* FAR 15.201. There was nothing improper in the Air Force's pre-RFP contacts with AKS.

CAMSS also argues that the Air Force violated 10 USC § 2319 by rejecting its offer, despite the fact that CAMSS did not submit snow and wind load test results (as required by the RFP) *or* any other technical or engineering data to demonstrate that its shelters could meet the RFP's snow and wind load requirements. The statute only requires that the Air Force consider CAMSS' proposal "*if* [CAMSS] can demonstrate to the satisfaction of the contracting officer that … its product meets the standards established for qualification or can meet such standards before the date specified for award of the contract." 10 USC § 2319 (emphasis added). CAMSS provided no engineering data *at all* upon which the Air Force could judge whether its offered shelters could meet the RFP's snow and wind load requirements. The Air Force considered CAMSS' proposal, but decided, based on the lack of any test reports or other data addressing snow and wind load, that CAMSS did not meet the RFP's requirements. The Air Force satisfied the statute, and CAMSS' argument to the contrary is without merit.

The only minor discrepancy at all that CAMSS can identify in this entire procurement is that the RFP contains an inadvertent, non-prejudicial typographical error. The RFP identifies the brand name shelter as the AKS 1836, rather than the correct AKS 1826. All of the salient characteristics, however, are entirely accurate. The Court should not sustain this ground of protest because CAMSS suffered no prejudice. AKS does not make a shelter called the "AKS 1836." This is not, therefore, a case in which there are two shelters, the 1826 and the 1836, thereby raising a question as to whether the Air Force received the proper shelter. There is only one relevant AKS shelter, the AKS 1826. That is the shelter the Air Force required, and that is the shelter AKS offered and delivered. CAMSS was not misled by the typographical error, and

CAMSS would not have altered its proposal in any way had it known of the typographical error. Because CAMSS' position did not change as a result of the typographical error in the solicitation, CAMSS did not suffer any prejudice, and the Court should deny this ground of protest.

Finally, even assuming *arguendo* that the contract here at issue were awarded in violation of law, the fact that the contract has been fully performed precludes it from being declared void *ab initio.* When a contract is in violation of law but has been fully performed, "courts have sustained the contract, reformed it to correct the illegal terms, or allowed recovery under an implied contract theory; *the courts have not, however, simply declared the contract void ab initio*." *Id.* at 1376 (emphasis added). The Court should accordingly enter judgment for the United States and against CAMSS.

## ARGUMENT

### A. CAMSS Lacks Standing To Maintain This Action

CAMSS cannot reasonably dispute the simple fact that it submitted a noncompliant proposal, and therefore lacks standing. Even setting aside the question of whether CAMSS submitted the mandatory wind and snow load test results, CAMSS concedes that it offered a 110 volt electrical system, rather than the 120 volt system required by the RFP. CAMSS Brief, pp. 18-20. The Air Force required a 120 volt system, rather than a 110 volt system, for safety reasons. *See* AR 258. Given that the RFP required offerors to propose a 120 volt system, and CAMSS indisputably offered a 110 volt system, the Air Force properly rejected CAMSS' proposal as noncompliant.

CAMSS does not dispute that it offered a noncompliant 110 volt electrical system. CAMSS Brief, pp. 18-19. CAMSS nonetheless argues that its failure to provide a compliant electrical system should be overlooked because there is very little difference between 110 volt

and 120 volt systems. *Id.* CAMSS does not, however, refute the Air Force's statement that there is a *safety-related* difference between the two types of systems relating to wet-stacking. Instead, CAMSS relies on the cursory, conclusory affidavit of its sales manager to assert that there is not really any difference between 110 volt systems and 120 volt systems. *Id.* CAMSS never addresses the Air Force's statement that there is a safety-related difference between the 110 volt system and the 120 volt system. Having failed to even address, let alone refute, the Air Force's statement that it required a 120 volt system for safety reasons, CAMSS has not met its burden of establishing that it has standing to maintain this action. The Air Force properly rejected CAMSS' proposal as noncompliant, and the Court should dismiss this protest for lack of standing.

**B. CAMSS' Lengthy Discussion Of Facts Relating The May 24, 2007 Request for Quotations Is Irrelevant**

CAMSS spends the first five substantive pages of its brief describing a series of supposedly improper events relating to a May 24, 2007 Request for Quotations ("RFQ"). CAMSS Brief, pp. 2-6. As CAMSS concedes, the May 24 RFQ was *canceled* before award *Id.* The May 24 RFQ is not in any way at issue in this bid protest, and all of the many pages of facts that CAMSS discusses relating to the May 24 RFQ are simply irrelevant.

**C. Exchanges Between The Air Force And AKS Before Issuance Of The RFP Were Entirely Proper Under FAR 15.201**

CAMSS attempts to make much of the fact that, in the course of preparing the RFP, the Air Force sought input from AKS concerning the salient characteristics of the AKS shelters that the Air Force required. CAMSS Brief, pp. 6-11. Although CAMSS suggests that the Air Force's contact with AKS was improper, CAMSS does not identify a single law that prohibits such contacts. CAMSS does not identify any laws prohibiting such contacts because there is no such law. The FAR quite plainly *encourages* an agency to exchange technical information with

industry in the course of preparing a solicitation. *See* FAR 15.201(a). The FAR specifically authorizes one-on-one exchanges with potential offerors to permit the agency to improve its understanding of industry capabilities. FAR 15.201(b) and (c)(4).

Moreover, notwithstanding CAMSS' rhetoric, the facts here are truly quite innocent. The Air Force's end-users had used AKS shelters as well as other shelters (called "DRASH" shelters) in the past, and knew that AKS shelters meet their shelter requirements. *See* AR 245, 258. The Air Force issued the May 24 RFQ in an effort to purchase AKS shelters -- which the Air Force knew would meet the end users' requirements -- off of the GSA Schedule. *Id.* After issuing the RFQ, the Air Force learned that the AKS shelters were not available on Schedule. *Id.* The Air Force then undertook an open-market procurement for AKS brand-name or equal shelters, as permitted by FAR 11.104. In preparing the RFP, the Air Force quite properly asked AKS to provide a list of the salient characteristics of the AKS shelters that the Air Force required, which AKS did. There is nothing improper whatsoever in the fact that, before issuing the RFP, the Air Force contacted AKS to obtain the salient characteristics of the AKS shelter, which the Air Force knew met its requirements. FAR 15.201.

**D. AKS Did In Fact Offer The Brand Name Product**

CAMSS argues that the Air Force should have rejected AKS' proposal because, according to CAMSS, AKS did not offer the brand-name product. CAMSS Brief, pp. 11-16.[1] CAMSS is incorrect. CAMSS bases its entire argument on an inadvertent typographical error in the RFP, which incorrectly identified the solicited shelter as the AKS "1836" rather than the "1826." The Air Force has made clear that the shelters AKS offered -- and already delivered -- are precisely the shelters the Air Force intended to purchase. *See* AR 229. AKS does not make

[1] On page 12 of its Brief, CAMSS asserts that counsel for AKS made certain representations. The quoted representations are from briefs submitted by the Government, *not* AKS. The supposed representations were not made by AKS' counsel, as CAMSS asserts.

any shelter called the "AKS 1836." *Id.* This is not a case, therefore, in which there are two shelters, the AKS 1826 and the AKS 1836, which would raise a question as to whether the Air Force received the proper shelter. There is only one relevant AKS shelter, the AKS 1826. That shelter is the shelter the Air Force intended to procure, and that is the shelter AKS offered and delivered. CAMSS' insistence that the shelters AKS offered are not the same as the shelters identified in the RFP is simply wrong.

Moreover, the Court should not sustain this ground of protest because it is clear that CAMSS suffered no prejudice as a result of the typographical error. CAMSS was not misled by the typographical error, and CAMSS would not have altered its proposal in any way had it known of the typographical error. Moreover, it is beyond reasonable dispute that the shelters AKS offered and delivered are in fact the very same shelters the Air Force intended to procure. Because CAMSS' position did not change as a result of the typographical error in the solicitation, and because the Air Force received exactly the shelters it solicited and required, CAMSS did not suffer any prejudice, and the Court should deny this ground of protest.

**E. The Air Force Complied With 10 USC § 2319**

CAMSS argues that the Air Force violated 10 USC § 2319(c) by rejecting CAMSS' proposal because CAMSS did not submit wind and snow load test results with its proposal. CAMSS Brief, pp. 20-25. CAMSS misreads the statute. The statute states that a potential offeror "may not be denied the opportunity to submit and have considered an offer for a contract" because it has not met a qualification requirement "*if* the potential offeror can demonstrate to the satisfaction of the contracting officer that the potential offeror or its product meets the standards established for qualification or can meet such standards before the date specified for award of the contract." 10 USC § 2319 (emphasis added).

First, the statute is not applicable here at all because the statute only concerns the use of a "qualification requirement," which is a mandatory requirement that a potential offeror must meet before it can even *submit* a proposal. *See Aydin Corp.- Recon.*, B-224185 (Feb. 10, 1987), 87-1 CPD ¶ 141. Here, the test report requirement was part of the proposal evaluation plan on a single, specific procurement, and therefore does not meet the definition of a qualification requirement. Moreover, because the Air Force did not preclude offerors from submitting a proposal, there was no qualification requirement, and the statute is inapplicable.

Second, even setting aside the question of whether the RFP's test report requirement was a qualification requirement at all, it is clear that the Air Force satisfied the statute. The Air Force permitted CAMSS to submit a proposal, and the Air Force considered CAMSS' proposal. CAMSS' proposal, however, did not address the RFP's test report requirement, and did not include any engineering data indicating that its shelters met the RFP's snow and wind load requirements. CAMSS provided no information whatsoever upon which the contracting officer could determine whether CAMSS' product met the RFP's wind and snow load requirements. CAMSS therefore did not "demonstrate to the satisfaction of the contracting officer" that its product could meet the RFP's wind and snow load requirements. The Air Force properly rejected CAMSS' proposal, and in no way violated any provision of the statute. CAMSS' arguments to the contrary are without merit.

### F. CAMSS' Arguments Concerning The Number Of Entries On AKS' Shelters And AKS' Warranty Terms Are Without Merit

CAMSS argues that the Air Force acted unreasonable in awarding the contract to AKS because, according to CAMSS, the shelters AKS offered do not meet the RFP's salient characteristics. CAMSS' argument is of course without merit because AKS offered – and delivered – the precise brand-name shelters that the Air Force intended to purchase. The fact

that there was an inadvertent, non-prejudicial typographical error in the RFP does not render AKS' entire proposal non-responsive.

CAMSS nonetheless asserts that the Air Force should have rejected AKS' proposal because it does not meet the RFP's supposed requirement for four entries. CAMSS Brief, pp. 12-14. CAMSS' argument is nonsensical. The RFP contains two requirements relating to entries. First, the RFP requires that each offered end panel must a have zipper entry. *See* AR 11. The RFP also required that each offeror propose "ONE PIECE PULLOVER LINER WITH TWO SIDE ENTRYS [sic]". *Id.* Because a liner covers the entire shelters, logic dictates that the two entries on the liner are intended to correspond with the two entries on the end panels of each shelter, for a total of two entries. CAMSS insists on making the utterly illogical argument that the RFP requires a total of four entries, one on each of the two end panels, and two more on the one-piece liner. This simply makes no sense. The pullover liner covers the whole shelter, and the two entries on the liner correspond to the two entries on the end panels, for a total of two entries on each shelter. The RFP does not require four entries, and the Air Force properly accepted AKS' proposed shelter despite the fact that it only has two entries.

CAMSS also argues that AKS' shelter does not meet the RFP's minimum 10-year useable life expectancy requirement. CAMSS Brief, pp. 14-15. CAMSS bases this argument on the fact that AKS included a one-year warranty with its shelters. In contrast, CAMSS offered *no* warranty whatsoever. CAMSS is confusing warranty period with useable life expectancy, which are very different requirements. *See* AR 257. The one-year warranty guarantees repair or replacement during the warranty period, but in no way indicates that the useable life expectancy of the shelter is only one year. The fact that AKS submitted a one-year warranty does not indicate that AKS' shelter will not meet the 10-year useable life requirement.

CAMSS' argument is particularly meritless because it offered no warranty at all. CAMSS therefore makes the illogical argument that a shelter with no warranty at all should have been evaluated as superior to a shelter with a one-year warranty. The RFP's requirement was for a 10-year useable life expectancy. The AKS shelters exceed that requirement, and *in addition* provide a one-year warranty. CAMSS' argument is without merit.

**G. Even If The Court Were To Sustain This Protest, The Court Should Not Order Termination Because The Contract Has Been Fully Performed**

The contract here at issue has been fully performed. Therefore, even if the Court were to grant CAMSS' protest, there is no remaining performance for the Court to enjoin. CAMSS nonetheless asserts that, although the contract has been fully performed, the Court may declare the contract void *ab initio*. CAMSS Brief, p. 17 (*citing Total Medical Management, Inc. v. U.S.*, 104 F.3d 1314 (Fed. Cir. 1997)).

CAMSS' reliance on *Total Medical Management* is misplaced. *Total Medical Management* involved a claim arising under the Contract Disputes Act, not a bid protest, and involved circumstances in which one of the parties to the contract sought to have it annulled before it had been fully performed. Here, neither party to the contract is seeking to have it annulled, and the contract has already been fully performed.

Even assuming *arguendo* that the contract here at issue were awarded in violation of law, the fact that the contract has been fully performed precludes it from being declared void *ab initio*. When a contract is in violation of law but has been fully performed, "courts have sustained the contract, reformed it to correct the illegal terms, or allowed recovery under an implied contract theory; *the courts have not, however, simply declared the contract void ab initio*." *Id.* at 1376 (emphasis added). In such circumstances, it is "only fair and just that the Government pay for goods delivered or services rendered and accepted." *United Pacific Ins. Co. v. United States*, 68 Fed. Cl. 152, 159 (2005). Thus, even if the Court were to determine that the

Air Force violated the law in the award of the contract, and even if the Court were to find that CAMSS was prejudiced, the Court should not terminate the contract. *Id.*

## CONCLUSION

For these reasons, the Court should enter judgment for the United States and against CAMSS on all counts of the complaint, and should deny CAMSS' request for injunctive relief.

Dated: January 15, 2008

Respectfully submitted,

By: ______________________________

Robert J. Moss
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-2200 (telephone)
(202) 420-2201 (facsimile)
MossR@dicksteinshapiro.com (email)

*Counsel of Record for Alaska Structures, Inc.*

Of Counsel:
Richard J. Conway
Justin A. Chiarodo
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-2200 (telephone)
(202) 420-2201 (facsimile)
ConwayR@dicksteinshapiro.com (e-mail)
ChiarodoJ@dicksteinshapiro.com (e-mail)