# In the United States Court of Federal Claims

Case No. 07-740C
(FILED UNDER SEAL: February 28, 2008)
CORRECTED VERSION*
TO BE PUBLISHED

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * *    * | |
| **CALIFORNIA INDUSTRIAL FACILITIES**    * | |
| **RESOURCES, INC. d/b/a CAMSS**    * | |
| **SHELTERS,**    * | |
| *Plaintiff,*    * | GSA Schedule; Open Market |
|    * | Solicitation; Brand Name or Equal; |
| v.    * | Salient Characteristics; Qualification |
|    * | Requirement; 10 U.S.C. § 2319; |
| **THE UNITED STATES OF AMERICA,**    * | Mootness; Standing; 10 U.S.C. |
| *Defendant,*    * | § 2305(b); Completed Contract; |
|    * | Permanent Injunction; Bid Protest |
| and    * | and Preparation Costs; Void *Ab Initio* |
|    * | |
| **ALASKA STRUCTURES, INC.,**    * | |
| *Intervenor.*    * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * *    * | |

    **William A. Shook**, Kirkpatrick & Lockhart Preston Gates Ellis LLP, Washington, D.C., attorney of record for the Plaintiff.

    **Marla T. Conneely**, Commercial Litigation Branch, Department of Justice, Washington, D.C., attorney of record for the Defendant.  With her on the briefs were **Peter D. Keisler**, Assistant Attorney General, **Jeanne E. Davidson**, Director, **Harold D. Lester, Jr.**, Assistant Director, and **Captain Christy J. Kisner**, United States Air Force, of Counsel.

    **Robert J. Moss**, Dickstein Shapiro LLP, attorney of record for the Intervenor. With him on the briefs were **Richard J. Conway** and **Justin A. Chiarodo**, Dickstein Shapiro LLP, of Counsel.*

    **Lauren A. Weeman**, law clerk.

    **Sharon J. Kim**, intern.

---

\* *The Opinion and Order has been updated to include the names of Intervenor's counsel and to show that it has been filed under seal.*

## OPINION AND ORDER

**BASKIR, Judge.**

This is a post-award bid protest.  The Plaintiff, California Industrial Facilities Resources, Inc. d/b/a CAMSS Shelters ("CAMSS"), challenges the Air Force's award of a purchase order for nine military shelters to Alaska Structures, Inc. ("ASI"), the Intervenor.  The complaint requests that the Court enjoin further performance by ASI and order a re-solicitation of the contract.  In light of intervening events, the Plaintiff now asks that the Court issue a permanent injunction and award bid preparation and proposal costs.

Currently before the Court are the parties' Cross-Motions for Judgment Upon the Administrative Record pursuant to Rule 52.1(b) of the Rules of the Court of Federal Claims ("RCFC").  A hearing was held on February 5, 2008.  **As a preliminary matter, the Court finds that, although the contract has been performed, this case is not moot, and the Plaintiff has standing to challenge the procurement.  However, the Court finds that the agency's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  The Court therefore GRANTS the Government's and Intervenor's Motions for Judgment Upon the Administrative Record.  The Plaintiff's Cross-Motion is DENIED.**

## BACKGROUND

### I.     Facts

The following facts are derived from the Administrative Record ("AR") which was filed and subsequently supplemented by the Government, as well as from the Consolidated Statement of Uncontroverted Facts ("CSUF") which was filed jointly by the parties.  The facts relevant to the disposition of the parties' cross-motions are not in dispute.  In addition, because several typographical errors are central to this protest, we have taken pains to identify them.

### A.     Original GSA Solicitation

On May 24, 2007, the Air Force issued a Request for Quotation ("RFQ") for a firm fixed price contract to provide seven "Alaska Extreme 1836 [sic] Shelter (Tan) Including Electircal/Lighting [sic] Kits, Plenum, One Piece Liner, Vinyl Floor and Soft Bag Carrying System, Part # AK-18EXT-26-2 [sic], Brand Name or Equal."  AR 8.  The requirement was a 100% Small Business Set-Aside for GSA Schedule holders.  AR 1. Five GSA Schedule holders were solicited, including ASI, which manufactured the brand name product.  AR 85.

On May 29, 2007, ASI submitted the only response to the RFQ.  ASI offered seven brand name "Alaska Extreme 1826 Shelters" with part number "AK-1826-XTR-2" for $142,360.00.  AR 79.  Immediately after submitting its proposal, ASI acknowledged that there was a discrepancy between the part number listed in the GSA Schedule solicitation and the part number of the shelters included in its proposal.  ASI alerted the Air Force via email on May 29 that the part number in the GSA Schedule solicitation contained a typographical error.  ASI confirmed that the correct part number was "AK-1826-XTR-2," not "AK-18EXT-26-2."  AR 70 ("I fat fingered the part number.  The correct part number is AK-1826-XTR-2.").  ASI did not, however, correct the error appearing in the brand name.  The correct brand name was "Alaska Extreme 18<u>26</u> Shelter," not "Alaska Extreme 18<u>36</u> Shelter."  *See* CSUF ¶¶ 18, 22.

During the evaluation of ASI's response to the RFQ, the Air Force determined that the shelters ASI offered were not quoted from ASI's GSA Schedule, but rather had open market prices.  AR 86.  The Air Force therefore concluded that ASI's quotation was nonresponsive.  AR 225.  Because ASI had been the only bidder, the Air Force withdrew the GSA Schedule solicitation.  AR 225.  The Air Force then decided to re-issue the solicitation as an open market, brand name or equal procurement. AR 225.  In a supplemental memorandum of law later submitted to GAO, the Air Force indicated that although it could have re-issued the solicitation as brand name only, it decided to go open market in order to "increase competition."  AR 225.

## B.    Open Market Solicitation

On June 18, 2007, the Air Force amended existing documentation for the procurement from "Set-Aside for GSA Schedule Holders" to "100% Small Business Set-Aside Open Market."  AR 86.  The Air Force posted a combined synopsis and solicitation on FedBizOpps on June 22, 2007.  The closing date for bids was June 28, 2007, six days later.  AR 86.  The solicitation called for quotations to supply "Brand Name or Equal Alaska Extreme 18<u>36</u> [sic] Shelter (Tan) including Electrical/Lighting Kits, Plenum, one piece liner, Part # AK-18EXT-26-2 [sic], quantity of 9 each," an increase from the seven shelters sought in the GSA Schedule solicitation. AR 10.  The open market solicitation perpetuated the two typographical errors that had appeared in the GSA Schedule solicitation.  The Air Force continued to refer to the brand name product as an "Alaska Extreme 18<u>36</u> Shelter" with part number "AK-18EXT-26-2" when it re-issued the solicitation.  *See* AR 10.

The open market solicitation included a list of 28 salient characteristics with which "or equal" products had to comply.  AR 10-11; CSUF ¶ 23.  The solicitation also stated: "When proposing an equal product be sure to to [sic] submit documentation which demonstrates the items [sic] comliance [sic] with the characteristics as mentioned above."  AR 11.  The first salient characteristic indicated that the shelters were to have a maximum width of 18'2 feet and a maximum length of 26'3 feet.  AR 10; CSUF ¶ 24. The solicitation included four other salient characters that are relevant to this protest:

11 (1) ONE PIECE PULL OVER LINER WITH TWO SIDE ENTRYS [sic] . . . . 12 THE ONE-PIECE LINER SYSTEM MUST HAVE BEEN TESTED AND APPROVED BY THE USAF IN A U.S. GOVERNMENT TEST FACILITY

18 (2) 120V RECEPTACLE LINES

27 SHELTER MUST HAVE BEEN SUCCESSFULLY TESTED BY AN INDEPENDANT [sic] LABORATORY TO WITHSTAND A 80 MPH SUSTAINED WIND LOAD FOR AT LEAST 30 MINUTES WITH INTERMITTENT 100 MPH WIND GUST (INCLUDE FINAL TEST REPORT WITH BID)

28 SHELTER MUST HAVE BEEN SUCCESSFULLY TESTED BY AN INDEPENDENT LABORATORY TO WITHSTAND A 15 POUND PER SQUARE FOOT SNOW LOAD (INCLUDE FINAL TEST REPORT WITH BID)

AR 10-11.  Finally, the solicitation stated that the shelters were to be delivered by August 31, 2007, and that the contract would be awarded to the "lowest price technically acceptable offeror who m[et] the requirements."  AR 11.

The Air Force received two responses to the re-issued solicitation: one from ASI and the other from CAMSS.  The Air Force accepted the proposal that ASI submitted on May 29 in response to the GSA Schedule solicitation as a brand name bid for the open market solicitation.  *See* AR 85-86.  However, ASI amended the price quoted in its May 29 proposal to reflect the cost of the two additional shelters.  The new price quoted by ASI was $183,015.00.  AR 86.  In addition, because the open market solicitation contained the two typographical errors that appeared in the original GSA solicitation, ASI's amended proposal for nine "Alaska Extreme 1826 Shelters" with part number "AK-1826-XTR-2" did not match precisely the terms of the open market solicitation.  *See* AR 60, 86.

CAMSS submitted a quotation for nine "CAMSS18EX Expeditionary Shelter Systems" at a total price of $97,410.99, approximately half the price bid by ASI.  AR 18.  CAMSS's proposal indicated that its shelters were "Engineered to withstand 80 mph sustained wind load for at least 30 minutes, with 100 mph gusts" and "Engineered to withstand a 15 psf snow load."  AR 14.  In addition, the bid indicated that CAMSS's shelters were outfitted with "Two (2) quick-connect 110V/20 amp outlet strings with 3 molded tri-plex outlets" and had a one-piece pull over liner system.  AR 17.  CAMSS did not submit any independent test reports with its bid.  *See* AR Tab 3; *see also* AR 83.

The Air Force completed a technical evaluation of CAMSS's bid on
June 28, 2007, by comparing the bid to the salient characteristics set forth in the
solicitation.  The Air Force program manager concluded that CAMSS's bid was not
acceptable.  AR 83.  The program manager noted the following deficiencies:

> No final test report from independent laboratory included for engineering
> to withstand 80 mph sustained wind load for at least 30 minutes, with
> 100 mph gusts
>
> No final test report from independent laboratory provided for engineering
> to withstand a 15 psf snow load
>
> No test report provided from a US government test facility indicating
> approval of the ONE-PIECE PULL OVER LINER SYSTEM
>
> Require 120V receptacle instead of the Two (2) quick-connect
> 110V/20 amp outlet strings with molded tri-plex outlets

AR 83.

The Air Force awarded the contract to ASI on July 2, 2007, and posted an Award
Notice on FedBizOpps on July 11, 2007.  AR 88.  The Air Force sent CAMSS a letter on
July 12, 2007, indicating that it was an unsuccessful offeror and that its bid had been
rejected because it was deemed "not to be technically acceptable."  AR 91.  The letter
further stated that this decision was based on CAMSS's failure to comply with the four
salient characteristics listed above and that CAMSS could request a debriefing.  AR 91.
CAMSS filed a written request for a debriefing on July 11, 2007, prior to receiving the
notification letter.  AR 124.  CAMSS also filed a bid protest at the Government
Accountability Office ("GAO") on July 12, 2007, to challenge the award to ASI.

On July 16, 2007, the Air Force conducted a telephonic debriefing with CAMSS.
AR 93.  During this debriefing, the Air Force indicated that CAMSS's bid had been
rejected because its proposal did not include final independent test reports for wind
load, snow load, or for the one piece pull over liner system.  AR 93.  Additionally, the Air
Force indicated that CAMSS's bid was noncompliant because its shelters had a 110V
receptacle which was different from the 120V receptacle called for in the solicitation.
AR 93.  Notes from the debriefing taken by the Air Force Contracting Specialist indicate
that CAMSS's Marketing Manager, Evan Bahe, admitted during the call that CAMSS
had not provided the required test results.  AR 94.  Mr. Bahe claimed that the testing
requirements were "too stringent" and violated Federal Acquisition Regulations.  AR 94.

The Air Force received official notification of CAMSS's GAO protest on
July 18, 2007.  AR 152.  A redacted copy of the protest letter was provided to ASI.
The following day, on July 19, 2007, the Air Force issued a stop work order to ASI,
presumably pursuant to FAR 52.233-3.  AR 152; *see also* 48 C.F.R. § 52.233-3 ("Upon

receipt of a notice of protest [] or a determination that a protest is likely [], the Contracting Officer may, by written order to the Contractor, direct the Contractor to stop performance of the work called for by th[e] contract.").

### C.    GAO Protest

CAMSS advanced several arguments in its GAO protest.  In the initial protest filed on July 12, 2007, CAMSS argued (1) that the award was inconsistent with the requirements set forth in the solicitation, (2) that the Air Force had improperly evaluated CAMSS's proposal, and (3) that the Air Force had made an unjustified "de facto sole source award" to ASI.  AR 157-58.  CAMSS amended its protest twice following the debriefing.  CAMSS presented additional arguments based on information learned during the debriefing, including (1) that the testing requirements were improper "qualification requirements," (2) that rather than offering the brand name ASI had in fact offered an "or equal" product which did not meet the terms of the solicitation, and (3) that the procurement was administered improperly because the offerors were not treated equally.  *See generally* AR Tabs 17-18.

With regard to the last argument, CAMSS alleged that personnel at ASI and the Air Force had a "close working relationship that prejudiced CAMSS Shelters."  AR 203. To support this argument, CAMSS pointed to frequent correspondence between ASI and the Air Force that took place throughout the administration of both the initial GSA Schedule solicitation and the open market solicitation that followed.  AR 203.  CAMSS further suggested that ASI had dictated the salient characteristics that were included in the open market solicitation.  *See* AR 203.  As part of its GAO protest, CAMSS requested that the Air Force produce all documents concerning ASI's offer and the establishment of the salient characteristics included in the solicitation.  AR 158.

The Air Force refuted each of CAMSS's arguments and denied any wrongdoing. Specifically, the Air Force maintained that all correspondence it had with ASI during the procurement process was conducted in an "effort to ascertain if ASI could meet the Air Force's needs."  AR 236.  In addition, the Air Force stated that the salient characteristics listed in the open market solicitation were based on "feedback from the warfighter in the field to withstand actual weather conditions," not by ASI.  AR 245.  The Air Force rebuffed CAMSS's allegation that it had conducted a de facto sole source award, emphasizing how it had "declined going forward with the GSA solicitation and procurement and re-issued the solicitation as an open-market solicitation" in order to promote competition.  AR 245.  Finally, the Air Force objected to submitting any further information or documentation relating to the establishment of the salient characteristics. The Air Force argued that "[h]ow it determined its needs [wa]s irrelevant."  AR 245.

GAO issued an opinion denying CAMSS's protest on October 19, 2007. AR 130.  GAO found that CAMSS's proposal was properly rejected by the Air Force because it failed to meet the salient characteristics set forth in the solicitation.  GAO also dismissed as untimely CAMSS's argument that the brand name submission

offered by ASI on May 29 was inconsistent with the terms of the solicitation because this argument had not been raised prior to the closing time for receipt of offers as required by GAO rules.  *See* AR 130; *see also* 4 C.F.R. § 21.2(a)(1) ("Protests based upon alleged improprieties in a solicitation which are apparent prior to bid opening or the time set for receipt of initial proposals shall be filed prior to bid opening or the time set for receipt of initial proposals.").  GAO therefore did not address the merits of this second argument.

### D.    Post-GAO Protest Events

The Air Force received preliminary notification from ASI on October 22, 2007, that CAMSS's GAO protest had been denied.  Defendant's Motion for Judgment Upon the Administrative Record ("Def. Br.") at App. A, Declaration of David Limbrick, Air Force Contract Specialist ("Limbrick Decl.") ¶ 18.  ASI also informed the Air Force on October 22 that CAMSS was likely to file a protest in the Court of Federal Claims seeking a temporary restraining order and a preliminary injunction.  *Id.*

The Air Force received official notification that CAMSS's GAO protest had been denied on October 23, 2007, the same day that CAMSS filed a bid protest in this Court. *Id.* ¶ 19.  Once GAO denied CAMSS's protest, the statutory stop work order that had been in place was lifted.  *See* 48 C.F.R. § 52.233-3.  The Air Force ordered ASI to ship the shelters on October 23.  *Id.* ¶ 18.  The Air Force apparently did so because there was an urgent need for the shelters.  *Id.* ¶ 19.  Incidentally, despite this urgency, the Air Force decided not to apply for an override of the statutory stay.  *Id.* ¶ 17; *see* 31 U.S.C. § 3553(d)(3)(C) (stating the conditions in which GAO will grant an override). The Air Force also ordered ASI to ship the shelters on October 23 because it apparently did not believe that CAMSS would be successful in obtaining preliminary injunctive relief from this Court.  *Id.*  All nine Alaska Extreme Shelters were delivered to the Air Force at various locations throughout the country between October 23 and 26, 2007.  *See id.* ¶ 21.

## II.    Procedural History

CAMSS filed a protest in this Court on October 23, 2007.  In addition to the complaint, CAMSS filed an application for a temporary restraining order ("TRO") and a preliminary injunction.  The Court held a status conference via telephone with the parties on October 24, 2007.  During this call, the Court discovered that CAMSS had not served the Department of Justice with a copy of the complaint, as required by RCFC Appendix C.  *See* RCFC App. C ¶ 10.  The Court therefore adjourned to allow CAMSS the opportunity to serve the Government.  Pursuant to the Rules of the Court, a request for a TRO ordinarily will not be acted upon until the Government has received a copy of the application, which is to be filed along with the complaint.  *See id.* ("An application for a [TRO] and/or preliminary injunction must be filed together with the complaint . . . .  The application also must be accompanied by a statement that plaintiff's

counsel has provided [] copies of the foregoing documents to the Department of Justice . . . . "), ¶ 14 ("Except in an emergency, the court will not consider *ex parte* applications for a [TRO].").

The Court held a telephonic hearing October 25, 2007, on CAMSS's request for preliminary injunctive relief. During this hearing, the Air Force informed the Court that the stop work order had been lifted on October 23 and that, as of the time of the hearing, the shelters were in transit to their respective destinations. Based upon this information and finding that CAMSS was not likely to succeed on the merits, the Court found injunctive relief inappropriate. We therefore denied CAMSS's motion for a TRO. Order Denying Motion for TRO, Oct. 26, 2007 (Docket No. 15).

The Government filed the Administrative Record for this protest on October 26, 2007, and supplemented it on October 31, 2007. After reviewing the Administrative Record, CAMSS filed a Motion for Limited Additional Production of Documents on November 5, 2007. Plaintiff's Motion to Produce Limited Additional Documents, Nov. 5, 2007 (Docket No. 25). CAMSS moved the Court to compel the Government to produce all documents and emails related to the establishment of the salient physical, functional, or performance specifications and independent testing requirements set forth in the open market solicitation. CAMSS noted that a similar request had been rejected during its GAO protest. *Id.* After finding that there may have been gaps in the Administrative Record that could hinder meaningful judicial review, on November 16, 2007, we granted in part CAMSS's Motion. Order Granting in Part and Denying in Part Motion to Produce, Nov. 16, 2007 (Docket No. 29).

The Government filed additional documents in response to the Court's November 16 Order on December 14, 2007. Defendant's Notice of Filing of Supplemental Materials, Dec. 14, 2007 (Docket No. 38). These documents, which appear at pages 337-52 of the Administrative Record, include a "Point Paper" regarding the Air Force's selection of deployable tents as well as an email from ASI to the Air Force dated June 20, 2007. The email states: "Please use the attached in the solicitation if possible." AR 350. Attached to the email is a spreadsheet containing the exact characteristics that later appeared in the open market solicitation which was posted on FedBizOpps on June 22. *Compare* AR 351-52 *with* AR 10-11.

The Government filed a Motion for Judgment Upon the Administrative Record and Opposition to Plaintiff's Motion for a Preliminary Injunction on November 9, 2007. ASI filed a similar motion the same day. CAMSS filed its Cross-Motion and Opposition on December 28, 2007.

**DISCUSSION**

**I.      Jurisdiction**

Pursuant to The Tucker Act, the Court of Federal Claims has jurisdiction to render judgment on a challenge by an interested party to "the award of a contract or any alleged violation of statute or regulation in connection with a procurement . . . . " 28 U.S.C. § 1491(b)(1).  The Court therefore has jurisdiction to entertain this bid protest, assuming CAMSS can overcome two jurisdictional challenges posed by the Government.  We address those jurisdictional challenges before turning to the merits of the protest.

**A.      Mootness**

The Government first argues that the Court lacks jurisdiction to entertain this suit because it is moot.  Def. Br. at 6.  The Government contends that, because the challenged contract has been executed, the Court can no longer award the injunctive relief sought by CAMSS.  *Id.* at 6-7.

The mootness doctrine originates from the "case or controversy" requirement of Article III of the United States Constitution.  *See Northrop Corp. v. United States*, 27 Fed. Cl. 795, 800 n.4 (1993) (discussing the mootness doctrine and its application by the Court of Federal Claims); *see also Flast v. Cohen*, 392 U.S. 83, 94 (1968) ("the judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.'").  Where allegations by a plaintiff become moot, there is no justiciable "case or controversy" for the court to decide and, as such, the court is divested of subject matter jurisdiction.  *Emery Worldwide Airlines, Inc. v. United States*, 47 Fed. Cl. 461, 469 (2000).

The burden of demonstrating mootness is a heavy one.  *County of Los Angeles v. Davis*, 440 U.S. 625, 631-34 (1979).  Mootness relates to the existence of a basic dispute between the parties, not only to the relief that has been requested.  *Intrepid v. Pollock*, 907 F.2d 1125, 1131 (Fed. Cir. 1990).  Therefore, although events subsequent to the filing of the complaint may moot a plaintiff's requests for relief, the constitutional "case or controversy" requirement may be satisfied by the availability of other relief.  *See Emery Worldwide Airlines, Inc.*, 47 Fed. Cl. at 469.  Indeed, where the court can still fashion a useful remedy, the case is not moot.  *NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998).

In addition to injunctive relief, CAMSS now seeks to recover bid preparation and proposal costs pursuant to 28 U.S.C. § 1491(b)(2).  Plaintiff's Cross-Motion for Judgment Upon the Administrative Record and Opposition to Defendant's Motion ("Pl. Br.") at 17-18.  The award of such costs is within this Court's power upon a finding of unreasonable action by the procuring agency.  *CCL Serv. Corp. v. United States*,

43 Fed. Cl. 680, 690 (1999).  The availability of this relief survives ASI's completion of the contract.  As such, there is a live justiciable issue for this Court to decide.

### B.      Standing

The Government also challenges jurisdiction on the grounds that CAMSS lacks standing to protest award of the contract to ASI.  A party invoking the jurisdiction of a federal court bears the burden of proving it had standing at the time the suit was brought.  *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002).  The Government contends that CAMSS lacks standing to bring this challenge because it is not an "interested party" under 28 U.S.C. § 1491(b)(1).  Def. Br. at 8-9.

The Tucker Act limits the bid protest jurisdiction of this Court to challenges brought by "interested parties."  *See* 28 U.S.C. § 1491(b)(1).  However, the statute does not define the term.  There are several tests that the Court may apply to determine whether the plaintiff is an "interested party" with standing.  *See CHE Consulting, Inc. v. United States*, 47 Fed. Cl. 331, 335-40 (2000) (applying three standing tests).  The standing test that the Government urges the Court to apply in this case is based upon the GAO definition of "interested party."  *See* Def. Br. at 9-10.  GAO has adopted a more restrictive definition of "interested party" than that set forth in section 702 of the Administrative Procedure Act ("APA").  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333-34 (Fed. Cir. 2001).  GAO defines "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by award of the contract or by failure to award the contract."  31 U.S.C. § 3551(2).  The Government argues that CAMSS does not meet this definition because its proposal, which allegedly failed to meet four salient characteristics required by the solicitation to be an "or equal" product, was technically unacceptable and therefore nonresponsive.  Def. Br. at 11.

The Federal Circuit has held that "[a] nonresponsive bidder is the epitome of one who lacks a direct economic interest."  *United States v. Int'l Bus. Machs. Corp.*, 892 F.2d 1006, 1012 (Fed. Cir. 1989).  Furthermore, a plaintiff's standing to protest the award of a contract to another bidder cannot be divorced from the responsiveness of the plaintiff's offer.  *Id.*  We are not convinced, however, that the rule regarding nonresponsiveness and standing applies here.  We base our decision on the nature of this protest.  The essence of CAMSS's challenge is that the Air Force, in violation of applicable statutes and regulations, enforced qualification requirements which prevented it from offering a responsive bid.  *See* Pl. Br. at 20.  CAMSS contends that its bid would have been responsive and would have presented the best value had the Air Force complied with proper procedures in administering the procurement.  *See id.* at 21.  CAMSS's challenge is therefore analogous to that brought by the plaintiff in *ATA Defense Industries, Inc. v. United States*, 38 Fed. Cl. 489 (1997).

In *ATA*, the Government argued that the plaintiff, a non-schedule contractor, lacked standing to challenge a Federal Supply Schedule contract. *Id.* at 495. Similar to CAMSS, the plaintiff in *ATA* challenged the procurement on the grounds that the contracting officer had adopted procedures that prevented it from being able to submit a competitive bid. *See id.* The Court in *ATA* held that the plaintiff had standing to bring the challenge, stating:

> . . . in contending that plaintiff could not have expected to present a bid and hence was not a "prospective bidder," [the Government] relies upon the very procurement procedures that plaintiff alleges violated the law. But if these procedures did violate controlling statutes and regulations, then the procedures cannot properly serve as a rationale for excluding plaintiff from coming within the scope of 1491(b).

*Id.*

As it did in *ATA*, the Government here bases its standing argument on the very procurement procedures that CAMSS claims were in violation of law. The Government's argument must once again be rejected. As this Court noted in *ATA*,

> . . . [s]ection 1491(b) is directed at permitting an "interested party" to secure legal redress when it has a sound objection to "the award of a contract or any alleged violation of statute or regulation in connection with the procurement" . . . . It would seem hard to write a description of a party that is more "interested" . . . than [the plaintiff in this case].

*Id.* (quoting 28 U.S.C. § 1491(b)). CAMSS is directly challenging the correctness of what it claims was the Air Force's improper decision to enforce qualification requirements against it. CAMSS therefore has standing. *Cf. CHE Consulting, Inc.*, 47 Fed. Cl. at 336 (finding that the plaintiff lacked standing under the GAO "interested party" test because the plaintiff never challenged the correctness of the Government's decision to enforce certain requirements against it).

## II.    Review of the Procurement

Having found that this case is not moot and that CAMSS has standing, we turn to the merits of the protest. The standard of review for bid protests is that established by the APA. Pursuant to the APA, agency action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 28 U.S.C. § 1491(b)(4) (specifying standard of review as found in 5 U.S.C. § 706(2)(A)). When considering a bid protest, the Court is not permitted to substitute its judgment for that of the agency, particularly if there is a reasonable basis for the agency action. *See Stapp Towing, Inc. v. United States*, 34 Fed. Cl. 300, 306 (1995). However, the agency

will not be permitted to act illegally.  *See GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 782 (1997) (noting that agency decisions, while entitled to deference, may be overturned).

### A.    10 U.S.C. § 2319

#### 1.    Qualification Requirements

In Counts 1 and 2 of the complaint, CAMSS challenges this procurement on the grounds that the Air Force acted in contravention of 10 U.S.C. § 2319(c)(3) by improperly enforcing "qualification requirements" against it.  Complaint ("Compl.") at 10-13.  Specifically, CAMSS objects to the enforcement of the three testing requirements set forth in the solicitation.  *Id.* ¶ 42 (citing to solicitation numbers 12 (testing of liner system); 27 (wind gust testing); 28 (snow load testing)).

Section 2319 defines a "qualification requirement" as "a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of a contract."  10 U.S.C. § 2319(a).  The provision, entitled "Encouragement of new competitors," states:

> A potential offeror may not be denied the opportunity to submit and have considered an offer for a contract solely because the potential offeror (A) is not on a qualified bidders list, qualified manufacturers list, or qualified products list, or (B) has not been identified as meeting a qualification requirement established after October 19, 1984, if the potential offeror can demonstrate to the satisfaction of the contracting officer . . . that the potential offeror or its product meets the standards established for qualification or can meet such standards before the date specified for award of the contract.

*Id.* § 2319(c)(3).

The statute sets forth certain procedures that must be followed when an agency imposes a qualification requirement.  Prior to establishing such a requirement, the agency head must, *inter alia*, "prepare a written justification stating the necessity for establishing the qualification requirement and specify why the qualification requirement must be demonstrated before contract award" and "specify in writing and make available to a potential offeror upon request all requirements which a prospective offeror, or its product, must satisfy in order to become qualified . . . . "  *Id.* § 2319(b)(1)-(2).  CAMSS argues that the procurement was in violation of law because the testing requirements constituted "qualification requirements" and the requisite statutory procedures were not followed.

The Government counters that 10 U.S.C. § 2319 is inapplicable because the solicitation did not contain "qualification requirements." Def. Br. at 14. The Government relies principally on *W.G. Yates & Sons Construction Co. v. Caldera*, 192 F.3d 987 (Fed. Cir. 1999), in making this argument. *W.G. Yates* concerned a government contract for the construction of a composite maintenance hangar and the design, manufacture, and installation of motor operated steel hangar doors. *Id.* at 989. A disappointed bidder, whose subcontractor had been rejected by the Government for failure to meet the pre-bid requirements set out in the solicitation, filed a bid protest in this Court which was denied. The contractor appealed to the Federal Circuit which affirmed in part and reversed in part.

In reaching its conclusion, the Federal Circuit clarified the difference between "qualification requirements" and other requirements that may be included in the solicitation, such as specifications. The Court stated:

> Specifications are the requirements of the particular project for which the bids are sought, such as design requirements, functional requirements, or performance requirements. ***The specifications for this project would include the size of the doors, structural steel requirements, ability to withstand wind loads, and the like***. Qualification requirements, on the other hand, are activities which establish the experience and abilities of the bidder to assure the [G]overnment that the bidder has the ability to carry out and complete the contract.

*Id.* (emphasis added) (citations omitted). The Court went on to hold that the requirement at issue in the case, which related to the subcontractor's successful completion of other similar projects was not a "specification." *Id.* Rather, the Court concluded that the Government had imposed a "qualification requirement" on the subcontractor and was therefore obliged to comply with section 2319. *Id.* The Court held that the Government's failure to comply with the statutory procedure concerning qualification requirements rendered the requirement invalid and unenforceable. *Id.* at 994.

Unlike the requirements at issue in *W.G. Yates*, the testing requirements enforced by the Air Force in this case did not relate to other contracts performed by CAMSS. To the contrary, the testing requirements related specifically to aspects of the particular contract for which bids were sought. Applying the reasoning set forth in *W.G. Yates*, the testing requirements did not constitute "qualification requirements." Indeed, the Federal Circuit explicitly stated in *W.G. Yates* that "the ability to withstand wind loads, and the like," constitutes a specification, not a qualification requirement. *Id.*

Numerous GAO decisions examining the scope of section 2319 support this conclusion.  GAO has stated that the statute "was not intended to apply to any individual specification of any one solicitation."  *Aydin Corp.* - Reconsideration, B-224185, 87-1 CPD ¶ 141 (Feb. 10, 1987).  Rather, as GAO has explained, the statute "only applies where the agency establishes a systematized quality assurance demonstration requirement on a continuing basis as an eligibility for award, such as a qualified products list, qualified manufacturers list, or qualified bidders list."  *Id*; *see also Scot, Inc.*, B-292580, 2003 CPD ¶ 173 (Oct. 3, 2003) ("The purpose of the qualification requirements system is to allow the efficient procurement of items that require substantial testing to demonstrate compliance with specification requirements . . . . The system is intended to be used prior to, and independent of, the specific procurement action.").

CAMSS's sole argument in defense is that the definition of "qualification requirement" included in 2319(a) is clear and unambiguous and that "the solicitation's requirements clearly meet this definition."  Plaintiff's Reply Brief ("Pl. Rep. Br.") at 11.  CAMSS relies entirely on a literal reading of the statutory definition of "qualification requirement."  In fact, although CAMSS cites extensively to *W.G. Yates* to make this textual argument, there is no citation in its briefs to the relevant portion of that opinion.  CAMSS has omitted any discussion of the portion of the opinion which contains the Federal Circuit's interpretation of the statutory definition of "qualification requirement."  *See* Pl. Br. at 25.  Counsel for the Plaintiff apologized for this failure at oral argument, and attributed it to oversight.  Oral Argument Recording ("OA Rec.") (Feb. 5, 2008) at 10:36:34 am.

CAMSS has not suggested an alternative interpretation of the term to that supplied by the Government.  Furthermore, Plaintiff's counsel was unable during oral argument to distinguish *W.G. Yates* or to otherwise discredit the Government's interpretation of what constitutes a "qualification requirement."  The Government's interpretation is well supported and controls in this case.  Accordingly, we find that the testing requirements included in the contract solicitation were not qualification requirements.  The procedures for establishing qualification requirements outlined in section 2319 are therefore inapplicable.

## 2.    Compliance With § 2319

Even if we were to find that the testing requirements were "qualification requirements," CAMSS has not shown that section 2319 was violated.  The plain language of the statute prohibits an agency from denying an offeror the

> ***opportunity to submit and have considered an offer*** . . . solely because the potential offeror . . . has not been identified as meeting a qualification requirement . . . ***if*** the potential offeror can demonstrate ***to the satisfaction of the contracting officer*** . . . that the potential offeror

or its product meets the standards established for qualification or can
meet such standards before the date specified for award of the contract.

10 U.S.C. § 2319(c)(3) (emphasis added).  The Air Force complied with these
requirements.

The solicitation was clearly designated as "BRAND NAME OR EQUAL ALASKA
EXTREME SHELTERS" and indicated that contractors offering an "or equal" shelter
were required to submit bids that complied with the 28 stated salient characteristics.
AR 10-11.  In addition, the solicitation instructed contractors proposing an "or equal"
shelter to provide documentation which demonstrated the shelter's compliance with the
salient characteristics.  *See* AR 11.

As noted in the background section of this Opinion, CAMSS's bid stated that its
shelters were engineered to withstand certain wind gusts and snow loads.  AR 14.  In
addition, the bid indicated that CAMSS's shelters were outfitted with "Two (2) quick-
connect 110V/20 amp outlet strings with 3 molded tri-plex outlets" and had a one piece
pull over liner system.  AR 17.  To this day, CAMSS argues that its proposal "met the
[solicitation's] requirements for wind and snow load."  Pl. Rep. Br. at 13.  As proof,
CAMSS relies upon the representations in its bid and an Air Force Contractor
Performance Assessment Report "for a similar shelter" that it submitted to the
contracting officer.  Pl. Rep. Br. at 13 (citing AR 28); *see also* AR 13 ("[We] have also
included [with our proposal] . . . the Environmental Operational Characteristics Test
Report for our Medium Shelter System, which we used as a model to design the
proposed shelter.").  CAMSS argues in its briefs, and reiterated at oral argument, that
the Assessment Report "clearly stated that the shelter system had been subject to
'severe laboratory and climatic testing' by the Air Force Operational Test and
Evaluation Center."  *Id.*  CAMSS maintains that this was sufficient to meet the terms of
the solicitation, at least with respect to the wind and snow load resistance
requirements.

Contrary to CAMSS's representations, the Assessment Report simply indicated
that prior testing by the Air Force of *similar shelters* used in a *different contract*
confirmed that those shelters could withstand certain hot and cold temperatures.  *See*
Defendant's Opposition and Reply Brief ("Def. Rep. Br.") at 9; AR 28-54.  The testing
completed for the Assessment Report had nothing to do with snow load or wind
resistance.  AR 36 ("The discussion of the environmental testing will be in two parts,
the hot temperature test and the cold temperature test.").  The Assessment Report
was the only testing documentation that CAMSS provided to the contracting officer.  At
no time did CAMSS submit the specific documentation called for in the solicitation –
namely, test reports from an independent laboratory showing that the shelters it
offered for *this* contract successfully met the wind and snow load requirements stated
in the solicitation.  Indeed, to this day CAMSS has not offered to supply any test
results or their equivalents.

CAMSS's failure to submit test reports as called for by the solicitation means that CAMSS submitted a noncompliant bid. *See Am. Governmental Marketing, Inc.*, B-294895 (Nov. 20, 2004), 2005 CPD ¶ 109, at *1 (stating that in a "brand name or equal" solicitation, any contractor offering an "or equal" product is required to demonstrate that the product conforms to the salient characteristics of the brand name product listed in the solicitation). The contracting officer determined as much after reviewing the bid against the salient characteristics set forth in the solicitation. *See* AR 83 ("[CAMSS's] quote was evaluated against the salient characteristics provided" and determined not to be technically acceptable).

By reviewing CAMSS's bid, the contracting officer met the requirements of 10 U.S.C. § 2319. Furthermore, the contracting officer's decision to reject the bid as noncompliant was supported by a coherent explanation and was therefore reasonable. *See Impresa Construzioni*, 238 F.3d at 1332-33 ("contracting officers are entitled to exercise discretion upon a broad range of issues [] in the procurement process" and "reviewing courts [must] determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.") (citations omitted). The contracting officer's decision must therefore stand. *See id.* at 1333; *see also Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994).

CAMSS now argues that the contracting officer should have engaged in discussions with CAMSS about its failure to submit the proper test reports and the difference between 110V and 120V receptacle lines. The Government has no such obligation where, as here, the solicitation states that the agency plans to evaluate proposals and award the contract without discussions. *See* 48 C.F.R. § 15.306(a)(3); AR 11; *see also DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 539 (2007) ("It is well-established that when offerors are on notice that award may be made without discussions, the government is not required, as a general rule, to hold discussions before award."). If CAMSS had an explanation or argument with respect to its compliance with salient characteristic 18, requiring 120V receptacles, it should have included that material along with its bid.

The Administrative Record shows that CAMSS was given an opportunity to submit a proposal and that the proposal was considered by the contracting officer. The contracting officer's decision to reject the proposal had a rational basis. We therefore find that, in the event that it applied to this case, section 2319 was not violated.

**B.    10 U.S.C. § 2305(b)**

Counts 3 and 4 of the complaint allege that the Air Force violated 10 U.S.C. § 2305(b) by accepting ASI's bid. Compl. at 13-15; Pl. Br. at 26-28. CAMSS contends that the statute was violated because the Air Force assessed ASI's bid based on factors other than those stated in the solicitation. *See* 10 U.S.C. § 2305(b)(1) ("The

head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."). There are two parts to CAMSS's argument. First, CAMSS argues that ASI did not in fact submit the brand name product because the brand name and part number of the shelters contained in ASI's proposal did not match the brand name and part number in the open market solicitation. Compl. ¶¶ 55-57. Second, CAMSS contends that because ASI did not submit the brand name product, ASI submitted an "or equal" bid which should have been rejected for failure to meet the salient characteristics listed in the solicitation. *Id.* ¶ 65.

CAMSS's argument is based upon the existence of two typographical errors in the open market solicitation that was posted on the FedBizOpps website. We discussed these errors in detail in the background section of this Opinion. First, instead of "Alaska Extreme 18<u>26</u> Shelter," the solicitation indicated that the brand name was "Alaska Extreme 18<u>36</u> Shelter." AR 10, 254. In addition, the solicitation indicated that the brand name shelter had part number "AK-18EXT-26-2," while the shelter contained in ASI's proposal had part number "AK-1826-XTR-2." AR 10, 58. The Government has admitted from the outset of this protest that the solicitation contained these errors. *See* Def. Br. at 23-27; Def. Rep. Br. at 6. However, CAMSS now argues that the existence of the errors meant that ASI did not in fact submit the "brand name" product, but rather offered an "or equal" shelter that was required to meet all of the salient physical, functional, and performance specifications listed in the solicitation. Pl. Br. at 26-27.

The success of CAMSS's argument depends on the Court's willingness to hold the Government to these typographical errors. This was the position of Plaintiff's counsel at oral argument. OA Rec. at 10:48:57 am. We are, however, unwilling to do so. First, all parties involved were apparently aware of the typographical errors from the start of the procurement. The parties agree that there is no such thing as an "Alaska Extreme 18<u>36</u> Shelter." CSUF ¶ 22; *see also* AR 254, 330-31. Plaintiff's counsel maintained at oral argument that CAMSS was unaware of this fact at the time of the solicitation. OA Rec. at 10:51:10 am. However, the Administrative Record indicates that CAMSS's Marketing Manager, who submitted the company's bid, is very familiar with and knowledgeable about ASI's shelters. AR 274 ("As part of my duties at CAMSS Shelters, I am [] responsible for being knowledgeable about . . . the products offered by our many competitors, including . . . shelters offered by Alaska Structures. That responsibility includes . . . being knowledgeable about shelter design features and user requirements."). Given this level of familiarity with ASI's products, we find it difficult to accept CAMSS's representation that it was unaware that ASI did not offer an "1836 Shelter" at the time of the solicitation.

Second, even if it was unaware of this fact, CAMSS cannot prove it was prejudiced by the typographical errors. The number in the brand name refers to the dimensions of the shelter. Def. Rep. Br. at 6. These dimensions were also clearly set forth in the list of salient physical characteristics included in the solicitation. AR 10;

CSUF ¶ 24.  The solicitation indicated that the Government sought shelters with the maximum dimensions 18 x 26, not 18 x 36.  *See* AR 10.  CAMSS offered shelters with the required dimensions.  AR 14.  Although CAMSS's proposal was ultimately rejected, it was not because CAMSS offered shelters with the wrong dimensions.  Accordingly, CAMSS was in no way prejudiced by the typographical errors in the solicitation.

We must note that CAMSS's contention that the Government should be held to these typographical errors is not only untenable, but also ironic given the presence of numerous errors in its own briefs.  We have already cited many typographical errors that appeared in the open market solicitation (for example, "entrys" in salient characteristic 11, the word "comliance," and repetition of the word "to").  These errors show that the Air Force was sloppy in administering the procurement.  For their part, there are also numerous errors throughout the Plaintiff's cross-motion and reply briefs.  *See*, *e.g.*, Pl. Rep. Br. at 7 (including an incomplete sentence and making three points numbered, respectively, "First," "Second," "Second."), 9 (stating that it is a "long-held princip<u>al</u>" that all offerors in a procurement are to be treated equally), 14 (the word "offeror" is misspelled as "offeor"); Pl. Br. at 22, ("has called" should be "had called"), 25 (including a lengthy quotation from *W.G. Yates* without a page cite).  These errors diminish the Plaintiff's advocacy.

Although we do not condone the Air Force's failure to correct the typographical errors in the open market solicitation, we find no justification for holding the Government to such obvious errors.  ASI clearly submitted the brand name product.  We therefore must reject CAMSS's argument that the procurement violated 10 U.S.C. § 2305(b).

## III.   Relief Sought

### A.   Permanent Injunction

CAMSS maintains that it is entitled to a permanent injunction.  Pl. Br. at 29.  However, CAMSS has not explained how this Court has authority to grant an injunction now that the contract has been fully executed.  CAMSS also has been unable to describe to the Court what such relief would look like.  At oral argument, Plaintiff's counsel was "unprepared" to respond to the Court's inquiry on this point.  OA Rec. at 11:06:42 am.  As the Government points out, courts generally lack the power to award injunctive relief where, as here, the challenged contract has been executed.  *See* Def. Br. at 7; *see also* Limbrick Decl. ¶ 21.  The nine shelters were shipped to various locations on October 23, 2007, as soon as the Air Force received official notification that CAMSS's GAO protest had been denied.  *Id.* ¶ 19.  The contract was therefore rendered complete not later than October 26, 2007, which was within days of the filing of this protest on October 23.

We do not approve of the Air Force's decision to ship the tents before allowing this Court an opportunity to consider the Plaintiff's request for preliminary injunctive relief.  In addition, we question the Air Force's decision not to apply for an override of the GAO stay when it apparently had an urgent need for the tents.  On the other hand, it is evident that Plaintiff's counsel could have acted with greater dispatch in filing the protest in this Court.  Nonetheless, the Air Force's actions do nothing to enlarge the limited scope of our equitable powers.  It is impossible, or at the least imprudent, for the Court to order the unraveling of a contract that has been substantially, if not completely, executed.  *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 846 (D.C. Cir. 1982) (if a contract has been satisfactorily performed, there is no justification for re-awarding the contract to a more deserving bidder).  Injunctive relief is not a realistic remedy in this case.  **We therefore must deny CAMSS's request for a permanent injunction.**

## B.    Declaring the Contract Void *Ab Initio*

CAMSS has also asked that the Court declare the contract between ASI and the Air Force void *ab initio*, or unenforceable.  *See* Pl. Br. at 17.  CAMSS believes that the Court should declare the contract unenforceable because it is, by its terms, plainly illegal.  *Id.* at 17 ("It is also within this Court's power to declare a contract void *ab initio* when it has been entered into in clear violation of law, and is therefore 'plainly illegal.'"); OA Rec. at 11:01:04 am.  Specifically, CAMSS argues that the contract is illegal and unenforceable because it was entered into in violation of 10 U.S.C. §§ 2319 and 2305(b).

CAMSS relies primarily upon *United States v. Amdahl Corp.*, 786 F.2d 387 (Fed. Cir. 1986), to support this claim for relief.  In *Amdahl*, the Government appealed a decision of the General Services Administration Board of Contract Appeals ("GSBCA") regarding a contract award to Freddie Mac for Automatic Data Processing equipment.  Amdahl, a losing bidder, challenged the award on the grounds that the contract, which contained provisions that violated a clear statutory prohibition against advance payments, was contrary to law and thus unenforceable.  *See id.* at 391-92.  The GSBCA declared the contract void *ab initio* and ordered the Government to return the equipment to Freddie Mac as well as to recover all advance payments.  *See id.* at 392.  The Government appealed on the grounds that the GSBCA lacked authority to order such relief.  *Id.*  The Federal Circuit reversed and vacated the decision in part holding that, because the equipment had been delivered and accepted, the GSBCA could not order the Government to return the equipment.  *See id.* at 398.  Freddie Mac could, however, retain the initial advance payment as compensation.  *See id.*

CAMSS's reliance on *Amdahl* is unavailing.  The case, which presents a unique factual situation, does lend some support to CAMSS's argument that a third-party may protest the award of an illegal contract and that such a contract may in turn be declared unenforceable – even where the subject goods have been delivered and

accepted. However, *Amdahl* is clearly distinguishable from this case. Unlike the contract at issue in *Amdahl*, the contract between ASI and the Air Force does not contain any patently illegal terms or provisions. *See also Total Med. Mgmt, Inc. v. United States*, 104 F.3d 1314 (Fed. Cir. 1997) (declaring contracts which had not yet been completed void on the grounds that they were in direct conflict with the regulatory scheme in effect at the time each of the contracts was entered into or renewed).

Furthermore, even if we were to find that the contract was contrary to law, it is unclear what CAMSS stands to gain by having the contract declared void *ab initio*. If we were to make such a declaration, CAMSS would still be limited to recovering the only remedy that is currently available to it – namely, bid preparation and proposal costs. *See Amdahl Corp.*, 786 F.2d at 398 (explaining that the GSBCA's award of costs and attorney's fees to successful bid protestor Amdahl remained intact even though the contract was void). **Accordingly, CAMSS's request that the contract between ASI and the Air Force be declared void *ab initio* is denied.**

### C.     Bid Preparation and Proposal Costs

Finally, CAMSS seeks to recover bid preparation and proposal costs pursuant to 28 U.S.C. § 1491(b)(2). Pl. Br. at 17-18. As noted above, the award of these costs is within our power upon a finding of unreasonable action by the procuring agency. *CCL Serv. Corp.*, 43 Fed. Cl. at 690. **However, having found no unreasonable or illegal action by the Air Force in administering this procurement, CAMSS's request must be denied.**

## IV.    Agency Conduct

Although we reject CAMSS's protest on the merits, we do not mean to suggest that we approve of the way the Air Force handled this procurement. We have already noted that we found several aspects of the procurement troubling, not the least of which was the persistence of the typographical errors in the open market solicitation. Other aspects of the procurement are similarly troubling. For example, the Air Force initially maintained that the salient characteristics set forth in the solicitation "were based on feedback from the warfighter in the field," AR 254, and objected to producing any documents relating to the establishment of the salient characteristics while the protest was before GAO. AR 347-49. However, it has since become clear that the list came verbatim from ASI. The documents produced by the Government in response to our November 16 Order establish ASI's authorship and confirm that the Air Force's initial explanation was not accurate.

The Air Force also suggested early on that the reason it re-bid the contract as open market after cancelling the GSA Schedule solicitation was to "increase competition." *See* AR 245. However, the truth is that the Air Force was forced to go to the open market once it realized that the shelters ASI offered in response to the GSA

solicitation were not on ASI's GSA Schedule.  AR 86.  The Air Force's suggestion that it re-bid the contract in order to promote competition was therefore not completely candid.

### CONCLUSION

For the reasons stated herein, **the Government's and Intervenor's Motions for Judgment Upon the Administrative Record are hereby GRANTED.  The Plaintiff's Cross-Motion is DENIED.  The parties are to bear their own costs.**

**IT IS SO ORDERED.**

s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge